AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☒ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☐ SUPERSEDING

---

**OFFENSE CHARGED**

Title 18, United States Code, Section 229(a)(1) and (2) - knowingly acquiring, receiving, owning, retaining, possessing, using or threatening to use, any chemical weapon, or attempting to do so.

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

PENALTY: Title 18, United States Code, Section 229A: any term of years imprisonment, 5 years supervised release, $250,000 fine, $100 special assessment.

---

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

**DEFENDANT - U.S**

▶ Sandford Bemi Faison

SEALED BY ORDER OF THE COURT

DISTRICT COURT NUMBER

**4-19-70023 MAG**

---

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE
SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form: Alex G. Tse

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned): Philip J. Kearney

---

**DEFENDANT**

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**FILED**
JAN 09 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

**IS IN CUSTODY**
4) ☒ On this charge

5) ☐ On another conviction  ☐ Federal  ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year
Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT     Bail Amount:

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:                                    Before Judge:

Comments:

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
#### Northern District of California

*Redacted Version*

| | |
|---|---|
| United States of America<br>v.<br>SANDFORD BEMI FAISON<br><br>Defendant(s) | Case No. 4-19-70023 MAG<br>UNDER SEAL<br>SEALED BY ORDER OF THE COURT |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __Dec. 9, 2018 - Jan. 8, 2019__ in the county of __Alameda__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 229(a)(1) and (2) | Attempt to Acquire a Chemical Weapon |

FILED
JAN 09 2019
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

This criminal complaint is based on these facts:
Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form
AUSA Philip J. Kearney

Complainant's signature
FBI SA Emily Sung
Printed name and title

Sworn to before me and signed in my presence.

Date: 1/9/19

City and state: Oakland, California

Judge's signature
Hon. Kandis A. Westmore, U.S. Magistrate Judge
Printed name and title

Document No.
District Court
Criminal Case Processing

# REDACTED AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A CRIMINAL COMPLAINT

Your affiant, Emily Sung, a Special Agent of the Federal Bureau of Investigation ("FBI"), having been duly sworn, deposes and states as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1.  I am an FBI Special Agent and have been so employed since November 2012. I attended the FBI Academy in Quantico, Virginia, completing the New Agents' Training in March 2013. I have received additional training on terrorist ideologies and the conduct of terrorism investigations. I am currently assigned to a Counter-Terrorism Squad in the FBI's San Francisco Field Office, San Jose Resident Agency as part of the Joint Terrorism Task Force.

2.  Additionally, I have also received training and instruction in and have participated in the execution of arrest and search warrants, and have been involved in investigations involving the use of the Internet. The facts in this Affidavit come from my personal observations, my training and experience, consultation with professionals in the applicable science fields, and information obtained from other agents, law enforcement personnel, and witnesses. This affidavit is intended to show there is sufficient probable cause for the requested warrant; therefore, it does not set forth all of the affiant's knowledge about this matter.

3.  Between December 9, 2018, and January 8, 2019, Sandford Bemi Faison attempted to purchase the [toxic chemical] to use as a chemical weapon via a "Dark Web" hidden services website. Faison paid for the purported [toxic chemical] with a digital "crypto" currency known as Bitcoin ("BTC"). The investigation has revealed that Faison ordered the [toxic chemical], a highly toxic chemical, in amounts capable of killing many people, to be delivered to the address of a third

---

Material In [brackets] was substituted for the true name of the substance.

party in Oakland, California. Neither Faison nor anyone residing at the delivery address is known to be engaged in an occupation or purpose that is allowed under 18 U.S.C. §229.

## II. STATUTORY AUTHORITY

4. Title 18 U.S.C. § 229(a)(1) makes it unlawful for any person to knowingly develop, produce or otherwise acquire, transfer directly or indirectly, receive, stockpile, own, retain, possess or use threaten to use, any chemical weapon or to assist or induce, in any way, any person to do the same. Section 229(a)(2) makes it unlawful to attempt or conspire to violate Section 229(a)(1).

5. The statutory definition of a "chemical weapon" includes the following: (A) A toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose. 18 U.S.C. § 229F(1).

6. The statutory definition of toxic chemical means any chemical, which through its chemical action on life processes can cause death, temporary incapacitation, or permanent harm to humans or animals. 18 U.S.C. § 229F(8).

7. The definition of "purposes not prohibited by this chapter" includes "Any peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity . . . . " 18 U.S.C. § 229F(7).

## III. FACTS ESTABLISHING PROBABLE CAUSE

8. In early December 2018, Faison, using an online moniker hereinafter referred to as "Moniker #1[1]," contacted an Online Covert Employee (OCE) of the FBI on a Dark Web hidden services website (Website #1).[2]

---

[1] The actual Moniker #1 that Faison used on Website #1 is known to law enforcement. The name has been anonymized for operational security reasons.
[2] The actual name of Website #1 is known to law enforcement. The site remains active and disclosure of the name of the site would potentially alert users to the fact that law enforcement

9. When Moniker #1 contacted the OCE, the OCE was offering to sell purported [toxic chemical] on Website #1. According to the FBI Laboratory in Quantico, Virginia, [toxic chemical] is a colorless, volatile, flammable, and highly toxic liquid. [Toxic chemical] is easily absorbed through the skin and may produce life-threatening systemic effects with only a single drop. Because of its high toxicity, the [toxic chemical] has very few legitimate applications and is primarily used in chemical research. It can be used to fatally poison humans. According to the National Institute of Health's online Open Chemistry Database, the [toxic chemical]'s hazard statements include "Danger Acute Toxicity," "Fatal if swallowed," "Fatal if in contact with skin," "Fatal if inhaled," and "AVOID ALL CONTACT!"

**Dark Web Communication between Moniker #1 and OCE**

10. On December 09, 2018, Moniker #1 stated the following to the OCE in apparent response to the OCE's advertisement on Website #1:

> "Newly joined but committed buyer here; figuring out how to fund my wallet, now. Thought to connect amd make a few[3] inquiries before ordering. How many vials of [toxic chemical] do you have left? Is the packaging inconspicuous, or do you use hazard labels?"

11. The OCE replied that the OCE had several vials remaining, did not use hazard labels, and took precautions during shipping.[4]

12. Moniker #1 replied:

---

action is being taken against the site, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, for the purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms.

[3]This quote and those that follow include a number of grammar and punctuation errors originally made by the messengers who are quoted verbatim.

[4]The communications of Moniker #1 are reported verbatim. The OCE communications are summarized due to operational concerns of verbatim language exposing tradecraft and investigative techniques.

> "Thanks for the update. I've been frustrated from having to pool alt-coins into BTC[5] (and do so anonymously), but will resume funding my DM[6] wallet this week. Wll then order ASAP!"

13. On December 10, 2018, the OCE acknowledged the reply from Moniker #1.

14. On December 12, 2018, Moniker #1 replied:

> "I got the BTC but then-of course-the value of BTC went down. Gonna wait it out some to avoid having to lose more in transfer fees. Plus, I'm still research applications of the product. Do you know if this stuff has any ill interactions with water? Also, I can't find any info on it's freezing point. Any insight welcome, and aiming to purchase before xmas!"

15. On December 15, 2018, Moniker #1 ordered and purchased one 10ml vial of the [toxic chemical] and requested shipment to an address in Oakland ("delivery address"). According to the FBI Laboratory in Quantico, Virginia, the lethal dose of the [toxic chemical] is approximately 0.10 ml - 0.14 ml, which equals 70-100 lethal doses per 10ml.

16. The purchase was made with BTC. The total purchase price for the [toxic chemical] was $95, which at the time of the transaction was the approximate equivalent of 0.0301 BTC. The total price was comprised of $75 for the [toxic chemical] itself and $20 for shipping.

17. On December 15, 2018, Moniker #1 stated:

> "Finally, gave up the ghost and added more funds… the name in the shipping address, is a local adult shop; so plain brown paper-like packaging wouldn't raise suspicion. If you can, aim to deliver on or shortly after xmas – fewer folks nosing around. Thanks and happy holidays!"

---

[5] An apparent reference to two types of crypto currency, "Alt" or Alternative coins and Bitcoins ("BTC"). BTC is commonly how items are paid for on Website #1.
[6] Based on your affiant's training and experience, "DM" is a reference to several terms including: "Darknet Market," "Darkweb Market," or "Dark Market."

18. Moniker #1 then sent an additional message:

> "Disregard my last message about delaying shipment.
> Send when ready!
> (1) I don't want to hold up your well deserved payment.
> (2) Lab supplies arrived early, so I'm now ready for yours.
> Forgive any confusion and thanks again!"

19. On December 18, 2018, the OCE responded that it would take several days to get the order ready, and asked if Moniker #1 had any questions about how to safely handle the [toxic chemical]. The OCE also asked if Moniker #1 wanted a tracking number for the shipment.

20. On December 21, 2018, the OCE responded that the Christmas holiday was delaying the OCE's ability to ship the order of the [toxic chemical], and offered to provide a container at no charge for the [toxic chemical].

21. Moniker #1 replied:

> "No worries - same here. Ship soon as you're able,
> and thanks for the free container! However, keep it
> in the sealed ampule... Or, did you mean you'd put the
> ampule in the container? Just don't open it! 8-p[7]
> Also, send an address and I'll forward/donate the rest
> of my 0.00034843 BTC. Thanks again!"

22. On December 27, 2018, Moniker #1 stated:

> "Ho ho ho!
> So, my Amazon order was blocked. No safety gear, yet...
> Still, ship when you can - the drop point is good 'til shortly
> after the new year. Just in case, that's [the delivery address] Oh, and
> Happy New Years! 8-D[8]"

---

[7] Believed to be a Dark Web reference to an emoji.
[8] Believed to be a Dark Web reference to an emoji.

23. The OCE responded that the order was almost ready to ship, and asked what name Moniker #1 wanted on the package. The OCE asked what Amazon order Moniker #1 was referring to, and what Moniker #1's time frame was.

24. Moniker #1 replied:

> "Sorry to confuse: Amazon order is separate from yours -
> I was just ranting...
> Name should be "R.V.O."
> Ship soon as you can. (Less drama on my end, if it arrives
> before Jan 2nd.) Many, many thanks!"

25. On December 28, 2018, the OCE provided Moniker #1 with the United States Postal Service ("USPS") Tracking Number 9114 9023 0722 4249 3946 65, for the [toxic chemical].

26. On December 29, 2018, Moniker #1 stated:

> "Sorry, my decryption process was ghetto and I didn't catch the tracking number in your earlier message...Can't wait to FE[9] this order, thanks again, and Happy New Years!!"

27. On December 29, 2018, the OCE resent the USPS Tracking Number to Moniker #1.

28. On December 31, 2018, the OCE checked in with Moniker #1 regarding the tracking number and described the packaging and concealment of the [toxic chemical]. The OCE advised Moniker #1 how to access a hidden compartment in the packaging containing the [toxic chemical] ampoule.

29. On January 05, 2019, Moniker #1 replied:

---

[9] FE is understood to be a term that is short for "Finalize Early" and is commonly used on dark web marketplaces to indicate the buyer's release of funds from the marketplace's escrow to the vendor.

> "Tracking number works, but USPS seems a day late...Understood about the toy truck location. Hopefully it arrives today!"

30. On January 7, 2019, the OCE reminded Moniker #1 to be careful handling the package.

**Postings on Dark Web (Hidden Services) Message Board**

31. Your affiant is also aware of a separate series of postings on an anonymous Dark Web message board website "Website #2"[10] that your affiant believes are attributable to Faison, and which Faison has admitted making. *See infra.* at ¶ 32, *et seq.* Based on your affiant's training and experience, Dark Web message boards are anonymous forums where users can post questions or comments anonymously or with an identified moniker and receive responses from other users.

32. On or around December 03, 2018, Faison, using the moniker "Anonymous #1" posted the following lengthy question involving the [toxic chemical]:

> "How and which [chemical #1] to procure Material Redacted from Original.
>
> Context
>
> I aim to ensure my wife's death within the 18 months, ideally long after our divorce is finalized (about 6-8 months from now). This is the only way I can begin a new life with full custody of my child. We currently live together, and I expect to have (easy) access to her environment and food for another 2 months at least.
>
> Despite a minuscule life insurance policy (under $30K) and a contentious but civil separation, I'm aware that I'd be a primary suspect if she so much as slipped on a banana peel. I feel that [chemical #1] poisoning would

---

[10] The name of Website #2 is known to law enforcement. The site remains active and disclosure of the name of the site would potentially alert users to the fact that law enforcement action is being taken against the site, potentially provoking users to notify other users of law enforcement action, flee, and/or destroy evidence. Accordingly, for the purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms.

7

reduce my culpability by delaying a final/accurate diagnosis and undermine any investigation. Material Redacted from Original.[11]

I'm no chemist but I am cautious and patient; I also have a separate location to mix chemicals. I've come to understand that I need soluble [chemical #1], of which there appear to be many sufficient compounds. Below are several questions where I could use your insight and advice.

Procurement

1. What's the simplest soluble [chemical #1] compound that can pass-thru the blood brain barrier? Could it be derived from home store products, like acetone, turpentine, etc.?

2. Material Redacted from Original.[12]

3. What is the recipe and process for making Material Redacted from Original.? Which and where does one get the needed bacteria? Do I just seal it with kombucha for a few days?

4. Should I bother trying to extract ~5g of [chemical #1] Material Redacted from Original., or just buy (more than I need) online?

5. Any ideas for an anonymous mail drop?

Application

1. Assuming the concoction is *not* odorless or tasteless, how do I expose my wife without compromising myself?

2. How could I spike her coffee grounds/maker, or take advantage of her coffee making routine?

3. Can I somehow paint the poison on a surface - like her keyboard or car door handle - or would it evaporate? Would mixing it with an oil work or just dilute the potency?

4. Material Redacted from Original

I'm indeed grateful for your time and this forum. Answer what you wish."

33. On or around December 10, 2018, Anonymous #1 asked the following on Website #2:

---

[11] Material Redacted from Original.
[12] Material Redacted from Original.

8

> "How to administer [toxic chemical] for assasination purposes?
>
> Finally acquired [toxic chemical]. Due to it's (reported) smell and known flammability, how would you expose someone, in order to kill them slowly?
>
> Some ideas I've had are:
>
> - dab on their hand/foot while asleep
> - place a drop in their favorite shoe
> - mix teeny amount in vaseline (or something) they would apply to themselves
> - dab on a doorknob they must enter (would the [chemical #1] amalgamate?)
>
> I originally wanted to place it in an extremely tiny packet, which they would inadvertently break open. But the only malleable material would be plastic - which the [toxic chemical] would eat through. Perhaps a packet made of lined aluminum foil could work? Material Redacted from Original.
>
> All ideas are welcome! I plan to test various delivery methods with red dyed alcohol over the next few weeks."

34. On or around December 10, 2018, an anonymous user, Anonymous #2, unknown to your affiant, asked Anonymous #1:

> Where did you get the [toxic chemical]?

35. Anonymous #1 replied:

> A well known marketplace. You can find several here https://www.deepwebsiteslinks.com/deep-web-markets-links/[13]

---

[13] Your affiant followed the URL posted by Anonymous #1 and found it to lead to a website, "DeepWebSitesLinks" containing a webpage titled, "Deep Web Markets Links | Darknet Markets Links | Onion Marketplace 2019." The webpage explained the definition of the Deep Web Marketplace stating "Darknet markets is a solution for all type legal or illegal products..." The webpage provided a list of Deep Web Market links detailing each marketplace's products and listings. Additionally, the webpage provided links to tutorials, including but not limited to, "how to access the deep web with anonymously," "How to access the Deep Web," and "Best

9

36. Between December 10th and December 21st, Faison, as Anonymous #1, continued to post on Website #2, seeking feedback on his plans to deliver the highly toxic chemical to kill his spouse and how to ensure his personal safety.

37. As noted below, Faison has admitted to being the individual using Moniker #1 and posting as Anonymous #1.

**Information Regarding the Identity of Moniker #1**

38. Alameda County[14] property records list the delivery address in Oakland, California to be owned solely by Individual #2, but that the residence is rented to an individual who is a known associate of Faison, Individual #1. Physical surveillance conducted by the FBI in December 2018, as well as open source database checks reveal that Individual #1[15] resides at the delivery address. Your affiant is aware that on or about December 21, 2017, the Oakland Police Department ("OPD") interviewed Individual #1 regarding an unrelated matter. During that interview, Individual #1 informed the OPD that he was a tenant at the delivery address, and was renting the property for approximately one year. Your affiant further believes that the name of the addressee, "R.V.O.," given to the OCE by Faison using Moniker #1, refers to Individual #1.

39. On or about December 28, 2018, physical surveillance identified a vehicle, a Chevrolet Volt bearing California license plate 6TSZ068, parked in the vicinity of the delivery address. According to California Department of Motor Vehicle records, the vehicle is registered

---

Privacy Tools."
[14] Oakland, California, is a city located within Alameda County, California.
[15] The full name of the individual referred to as Individual #1 is known to law enforcement. It has been anonymized to protect an ongoing investigation.

to Sandford Faison (Faison). Subsequently, on or about January 2, 2019, Faison's vehicle was observed in the driveway of the delivery address location. Your affiant is aware that on or about October 4, 2018, the OPD responded to a call for a domestic disturbance involving Faison at his residence, Faison told the OPD that he and his wife were having issues and might be separating soon. Both Faison and his wife relayed to OPD that they had been married for eight years and had two children in common.

**Apparent Friendship Between Faison and Individual #1**

40.  Based on the investigation to date, I believe that Faison and Individual #1 share a friendship. On or about January 3, 2019, physical surveillance observed Faison drive his vehicle to the delivery address, and pick up Individual #1. Together, they drove to a parking lot and proceeded to walk to a nearby coffeehouse in San Leandro, California. They were observed sitting together inside the coffeehouse having food and conversing. Individual #1 was overheard telling Faison 'we have job to get done between us,' and Faison was heard to reply with an affirmative "mm-hmm." Later, Faison and Individual #1 departed the coffeehouse together and Faison dropped Individual #1 back at the delivery address.

**Education and Employment History**

41.  Based on a review of Faison's employment history, Faison was most recently employed at Paypal, Inc. and previously worked for GEP Talent Services. Your affiant is aware of a résumé on a blog believed to be maintained by Faison stating that he attended Middlebury College in Vermont for one year. Faison listed several web developer jobs as well as multiple computer programming languages under his technical proficiencies. Faison does not appear to have been engaged in any endeavor that would use the [toxic chemical] for any legitimate purpose.

## Controlled Delivery, Search, and Arrest

42. On January 8, 2019, at approximately 4:00 pm, a controlled delivery of a package was made to the associate of Faison, "R.V.O." at the delivery address, per Moniker #1's instructions noted above. The package was left on the front porch of the residence. Thereafter, at approximately 5:42 pm, Faison arrived at the residence driving his previously-described Chevy Volt automobile. After parking and exiting his car, Faison walked to the home's front porch and retrieved the package. Faison made no attempt to knock on the front door of the residence or make contact with any occupants. After retrieving the package, Faison took the package back to his automobile and drove away from the location.

43. FBI covert surveillance teams followed Faison back to his residence in Oakland. Faison arrived at the location at approximately 5:49 pm. Surveillance teams observed Faison enter the premises with the package.

44. Thereafter, at approximately 7:00 pm, a covert electronic triggering device placed within the package by the FBI signaled that the contents of the package had been opened. After this electronic signal was received by the FBI, the OCE received a message from Moniker #1. In the email, Moniker #1 told the OCE that he had received and retrieved the delivery.

45. At approximately 8:00 pm, FBI SAs executed a federal search warrant at Faison's home. After entry, FBI SAs detained Faison pending the search of his home. Thereafter, Faison was transported to the Oakland FBI Resident Agency.

46. At the FBI Resident agency, your affiant read Faison his *Miranda* rights, and received an acknowledgment from Faison that he understood his rights. Thereafter, Faison indicated his desire to talk to your affiant. During the subsequent video-recorded interview, Faison admitted to your affiant that he purchased the toxic chemical on Website #1 using crypto

currency. Faison stated that he wanted to have the substance on hand to use on his wife. Faison characterized his behavior as "premeditated." Faison also admitted that before obtaining the [toxic chemical], he had considered hiring a hitman on the Dark Web to use against his wife. Faison stated that he concluded that hiring a hitman 'would be as expensive as getting a divorce,' so he abandoned that plan. Faison also stated that the [toxic chemical] would cause his wife's death after their divorce.

47. Faison admitted that he had posted the questions noted above as attributed to Anonymous #1 on Website #2.

48. FBI SAs searching Faison's home recovered personal protective equipment including two sets of gloves, and a respirator, as well as the cellular telephone used to track the package, and the ampoule of purported the [toxic chemical] (which had been removed from the package), among other items. During his interview, Faison told your affiant where in his home he had secreted the ampoule; the ampoule was eventually found by agents in that location.

IV. CONCLUSION

49. Based on the foregoing information, I believe there is probable cause to arrest Sandford Bemi Faison for attempting to possess a chemical weapon in violation of 18 U.S.C. § 229(a)(1) and (2).

50. The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

V. REQUEST FOR SEALING

51. It is respectfully requested that this Court issue an order sealing, until further order of the Court, this Affidavit, including the Complaint cover sheet, and Sealing Order. Your affiant believes that sealing these documents is necessary due to the ongoing investigation.

49. Based on the foregoing information, I believe there is probable cause to arrest Sandford Bemi Faison for attempting to possess a chemical weapon in violation of 18 U.S.C. § 229(a)(1) and (2).

50. The facts set forth in this affidavit are true and correct to the best of my knowledge and belief.

## V. REQUEST FOR SEALING

51. It is respectfully requested that this Court issue an order sealing, until further order of the Court, this Affidavit, including the Complaint cover sheet, and Sealing Order. Your affiant believes that sealing these documents is necessary due to the ongoing investigation. Based upon your affiant's training and experience, your affiant has learned that criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to associates, co-conspirators, and/or the public. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,

Special Agent Emily Sung
Federal Bureau of Investigation

Subscribed and sworn before me by Special Agent Affiant per Fed. R. Crim. P. 41(d)(3) on this 9th day of January 2019.

HON. KANDIS A. WESTMORE
UNITED STATES MAGISTRATE JUDGE

14